# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JOHN W. DANIEL & CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| DURHAM PUBLIC SCHOOLS | ) | **AND RECOMMENDATION** |
| BOARD OF EDUCATION and | ) | 1:07-CV-61 |
| LS3P ASSOCIATES, LTD., | ) | |
| SUCCESSOR BY MERGER TO | ) | |
| BONEY, PLLC, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the following motions: (1) a motion for summary judgment by Defendant Durham Public Schools Board of Education ("DPS") (docket no. 43) and (2) a motion for summary judgment by Defendant LS3P Associates, Ltd. (docket no. 41).  Plaintiff has responded in opposition to the motions, and the matter is ripe for disposition.  Furthermore, the parties have not consented to the jurisdiction of the magistrate judge.  Therefore, the motions must be addressed by way of recommendation.  For the following reasons, it will be recommended that the court deny the motion for summary judgment brought by DPS and grant the motion for summary judgment brought by LS3P Associates, Ltd.

## BACKGROUND

This case arises from a construction contract between Plaintiff/Contractor John W. Daniel Co., Inc. ("Daniel") and Defendant/Owner DPS for renovations and additions to a Durham middle school. Daniel seeks recovery of additional payments it alleges are due under the Contract. Daniel also seeks damages for delays it claims were caused by DPS and Defendant/Architect LS3P Associates, Ltd., the successor by merger to Boney, PLLC (hereinafter referred to as "Boney"). More specifically, the Complaint alleges (1) a claim for breach of contract against DPS (First Cause of Action); (2) a claim for breach of contract "with respect to subcontractors" against DPS (Second Cause of Action); (3) a claim for breach of warranty against DPS (Third Cause of Action); (4) a claim for negligence against Boney (Fourth Cause of Action); and (5) a claim for professional malpractice against Boney (Fifth Cause of Action).[1]

DPS has counterclaimed against Daniel for breach of contract, alleging that Daniel failed to perform the work as required and refused to make satisfactory corrections to work that was not done properly. DPS also seeks a declaratory judgment that it is entitled to hold retained funds, as provided in the Contract, until the requirements of the Contract have been fulfilled and DPS has been satisfied for its damages.

---

[1] The action is in this court based on diversity jurisdiction.

## STATEMENT OF THE CASE

<u>Undisputed Facts</u>

Rogers-Herr Middle School is a public school in Durham, North Carolina, operating on a year-round schedule.  In 2001, DPS decided to construct additions to the school buildings, renovate the existing building, and upgrade the existing site, including the athletic fields (hereinafter referred to as "the Project").  In 2001, DPS contracted with architectural firm Boney, PLLC, to design the additions and renovations and to provide construction administration services for the Project.  Boney, in turn, contracted with various engineering firms to provide engineering plans and specifications and to serve as consultants on the Project.

In December 2002, Daniel was selected as the general contractor for the Project.  Daniel and DPS thereafter entered into a construction contract dated January 13, 2003 (the "Contract").[2]  The Project was to be constructed in phases.  Phase I focused on construction of the new building additions.  Phases IIA and IIB focused on renovations of the existing school building and removal of existing mobile classroom units.  In addition, site work was spread across the various phases and included renovations of existing athletic fields, construction of a football field circled

---

[2] By its terms, the Contract consisted of the signed Agreement between the parties, the general and supplementary conditions, drawings and specifications, addenda issued before execution of the Agreement, and all modifications issued after execution of the Agreement.  The parties used the following standard forms: the American Institute of Architects Standard Form of Agreement Between Owner and Contractor Where the Basis of Payment is A Stipulated Sum, AIA Document A101-1997, as modified, and the General Conditions of the Contract of Construction, AIA Document A201-1997.

-3-

by a running track, construction of new parking areas, widening of neighborhood roads, construction of a new detention pond, and landscaping.

The Contract stipulated dates by which each Phase of the Project was to reach Substantial Completion and Final Completion, with liquidated damages to be assessed against Daniel for each day the Project exceeded the completion deadlines. A Phase would be considered substantially complete when the work was sufficiently complete so that DPS could occupy or use that Phase of the Project for its intended use. A Phase would be declared finally complete when Boney certified the work as being finally complete, as evidenced by Boney's approval of a final certificate of payment recommending that DPS release a ten percent retainage withheld for each Phase of the Project. The original Contract Sum was $9,766,000.00, plus unit prices for certain items, including the removal and disposal of unsuitable soils. Progress payments, less ten percent held as retainage, were to be made on a monthly basis, with final payment to be made upon Final Completion of each Phase I and II.

Problems and Delays with the Project

As bid, the Project was scheduled to begin construction February 13, 2003. The Contract provided that all site work was to be completed by January 5, 2005. DPS's dispute with a neighboring landowner and other circumstances, however, delayed the start date of the Project until around May 1, 2003. Therefore, the start date for the Project was delayed 87 days and accordingly the completion date of the

-4-

Project was adjusted by 87 days, as reflected by Change Order No. G-4. In addition to postponing dates of completion, DPS and Boney moved the site work for the baseball and softball fields from Phase I to Phase IIB, and adjusted the phasing of the building renovation work.

The two new Phase I buildings were substantially completed by July 2004.[3] Daniel started Phase IIA work on June 14, 2004, several weeks before the completion of Phase I work. After a delay of several months, Boney certified the Phase I work as being finally complete, and DPS released to Daniel the Phase I retainage in January 2005. Daniel contends that it achieved Substantial Completion of Phase IIA in February 2005 and Phase IIB in September 2005. Boney refused, however, to certify those phases as being finally complete. DPS issued a stop work order with respect to the athletic fields and finished that work itself using other contractors and maintenance personnel. Daniel withdrew from the Project in November 2006.

Daniel has submitted a pay application to DPS in the amount of $10,577,071.00 for work performed under the Contract. Of this amount, DPS has paid Daniel $10,028,399.00. Daniel contends that DPS owes it a balance due under the pay application of $548,672.00, which includes monies owed for work done on

---

[3] Daniel states in its brief opposing summary judgment that the completion date was July 12, 2004, whereas DPS states that the completion date was July 24, 2004. Because this factual issue is not material to the motion for summary judgment, the court need not address this discrepancy further.

approved Change Orders. Daniel contends that it is also owed $105,302.00 for work done pursuant to Change Order Requests ("CORs") that were rejected and $176,188.00 for replacement of unsuitable soils. Therefore, Daniel contends that it is owed the principal amount of $830,162.00 under the Contract, plus interest. Furthermore, Daniel contends that it is entitled to additional compensation for costs incurred as a result of delays in the Project.

Daniel's Claims and Disputed Facts

In its claims against DPS and Boney, Daniel contends that DPS and Boney consistently caused delays on the Project by, among other things, failing to timely return specification submittals, pay applications, and CORs and by releasing color schedules and revised construction plans long after they were expected. (*See, e.g.*, Dep. Ex. 35, Ex. 519; Dep Ex. 36, Ex. 520; Dep. Ex. 43, Ex. 609; Dep. Ex. 44, Ex. 522.) According to Daniel, these delays meant that Daniel could not bill, and was not being timely paid, for work on the Project, and Daniel's subcontractors were in turn not being paid for work completed on the job, causing some of them to demobilize or reduce their workforce. (Stevens Dep. 66-68, Ex. 512; Dep. Ex. 32, Ex. 530; Dep. Ex. 48, Ex. 515; Dep. Ex. 54, Ex. 613; Dep. Ex. 100, Ex. 531.) Daniel contends that the excessive number of errors in the drawings and specifications and unforeseen conditions encountered on the Project were greatly exacerbated by the inability of Boney and/or DPS to provide timely responses to Daniel's Requests for Information. (Stevens Dep. 26-27, 43-44, 46-48, 64-69; Fite Dep. 72-75, Ex. 510;

-6-

Perkins Dep. 28-32, Ex. 612.) Daniel contends that Boney and its consultants were also consistently late in responding to Daniel's Requests for Information, to the point that it became a joke among the subcontractors that "they might as well go home" because receiving a response would take so long. (Stevens Dep. 15-16, 21-22, 50-52, 55-57; Fite Dep. 63; Perkins Dep. 16-20; Dep. Ex. 54, Ex. 523.) Daniel further maintains that DPS and Boney were unable to timely resolve issues that arose with the utilities and the City and County of Durham, all of which significantly held up construction on the Project. (Perkins Dep. 31-32; Stevens Dep. 37-48; Burnette Dep. 93-94, Ex. 524; Johnson Dep. 103; Lee Dep. 40, Ex. 525; Dep. Ex. 79, Ex. 526; Dep. Ex. 82, Ex. 527; Dep. Ex. 225, Ex. 528.)

Daniel contends that the Project was further delayed for other reasons not within Daniel's control. For instance, Daniel contends that the 87-day start delay and the phasing changes on the Project caused a "seasonal delay" that prevented Daniel from completing certain items of work in the time originally contemplated. (Burnette Dep. 63-64, 78-79; Stevens Dep. 15, 18; Bahr Dep. 93-99; Dep. Ex. 50, Ex. 532; Dep. Ex. 100; Dep. Ex. 225.) For example, the landscaping work and seeding of the athletic fields, which were originally scheduled to be performed in favorable cool and wet weather periods, were pushed into unfavorable hot and dry seasons by the 87-day start delay, forcing Daniel to delay the work until the conditions were favorable for planting. Daniel contends that it was further delayed by adverse weather conditions. (Dep. Ex. 54.) Daniel contends that there also was a significant volume

-7-

of unsuitable soils on the Project that had to be undercut and replaced, necessitating time extensions to complete the work. (Fite Dep. 93-94; Reeder Dep. 52, 62; Burnette Dep. 79-83; Stevens Dep. 34-37; Dep. Ex. 23, Ex. 533.) Daniel contends that the late responses from DPS's geotechnical consultants regarding the unsuitable soils further added to the delays. (Reeder Dep. 55-57, Stevens Dep. 11-12, 56, 61-62; Dep. Ex. 40, Ex. 534.) Daniel contends, furthermore, that the sheer number of Change Orders, representing roughly $1 million of extra work and for which no additional time was added to the Contract, greatly increased the delay on the Project. (Fite Dep. 108-10; Burnette Dep. 253-54, 258-59; Dep. Ex. 54; Dep. Ex. 100.) Daniel contends that despite the fact that the Project experienced significant delays outside of Daniel's control, DPS did not grant any time extensions to Daniel under the Contract.

DPS and Boney generally deny that they caused the delays in the Project and they also blame Daniel for some of the delays. Moreover, DPS contends that Daniel may not recover for the amounts claimed because Daniel failed to comply with the Contract's time limits and written requirements for submitting CORs and for requesting time extensions. DPS further contends that certain Change Orders constitute a final resolution of several of Daniel's claims for unpaid monies. In its Answer and Counterclaim, DPS alleges that it is due liquidated damages under the Contract for Daniel's failure to complete the Project under the Contract's time schedule. DPS contends that it is, therefore, holding $548,672.00 in retainage for

-8-

work under the Contract not performed by Daniel, or not completed in satisfactory fashion as required under the Contract and for liquidated damages and actual damages due DPS from Daniel under the Contract.  DPS further asserts that it does not owe Daniel $176,880.00 for the replacement of unsuitable soils, or $105,302.00, representing the amount of work done on CORs that were rejected.  DPS has filed a motion for summary judgment on Daniel's breach of contract claim, disputing the alleged amounts owed under the Contract.   Moreover, DPS seeks summary judgment as to Daniel's second claim against DPS titled "Breach of Contract With Respect to Subcontractors" and Daniel's third claim against DPS for breach of implied warranty.  Finally, Boney has also filed a motion for summary judgment on Daniel's fourth and fifth claims alleging "negligence" and "professional malpractice" against Boney.  In support of its motion for summary judgment, Boney contends that Daniel has failed to submit sufficient evidence of the applicable standard of care.

## STANDARD OF REVIEW

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997).  The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a

-9-

genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact-finder to return a verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

## DISCUSSION

### I. Summary Judgment With Respect to Daniel's Claims Against DPS

### A. DPS's Motion for Summary Judgment as to Daniel's Second Cause of Action for Breach of Contract "With Respect to Subcontractors"

I first address DPS's motion for summary judgment as to Daniel's Second Cause of Action titled "Breach of Contract With Respect to Subcontractors." DPS contends that through this claim Daniel is attempting to recover damages on behalf of subcontractors that worked on the Project and who did not get paid in a timely fashion or at all as a result of DPS's alleged tardiness in paying and failure to pay

-10-

Daniel for certain work.  DPS contends that the plain language of the Contract bars

Daniel from bringing this claim.[4]  DPS first notes that the plain language of the

Contract makes clear, and Daniel does not dispute, that subcontractors are not

parties to the Contract.  (*See* Contract, General Provisions, Article 1.1.2, attached

to Reeder Aff., No. 7, Ex. 400, docket no. 44.)  DPS further notes that the required

payment bond and the indemnity provision in the Contract preclude Daniel from

recovering damages on behalf of its subcontractors.[5]  (*See* Contract, Supplementary

Provisions, Article 5.1.2, attached to Reeder Aff., No. 8, Ex. 400, docket no. 44.)

---

[4]  DPS also contends that this claim is barred by Daniel's failure to follow the Contract procedures for asserting such claims before litigation.  (*See* DPS Reply Br. 3-4; Daniel Opp'n Br. 11.)  As discussed *infra*, however, Daniel has sufficiently shown that there are genuine issues of fact as to whether the parties orally modified the Contract regarding the requirements for bringing claims under the Contract.

[5]  Article 5.1.2 of the Supplementary Conditions provides:

> The General and other Prime Contractors shall comply with North Carolina 'Contractor's Lien Statutes' and shall coordinate with their subcontractors to assure their compliance with these statutes.  All costs involving the Owner in litigation between [sic] and the sub-contractors and subcontractors and Contractors . . . shall be borne entirely by the Contractor and/or his subcontractor and the Owner shall be held harmless.

Under North Carolina law, a general contractor must furnish a payment bond to guarantee payment to unpaid material suppliers, laborers, and certain subcontractors, via the surety, in case of default by the principal.  *See* N.C. GEN. STAT. § 143-129 and Article 3 of Chapter 44A of the General Statutes.  This bond is required by statute to provide the functional equivalent of a materialmen's lien to laborers and materialmen.  *See* N.C. GEN. STAT. §§ 44A-26, 143-129; *Am. Bridge Div. U.S. Steel Corp. v. Brinkley*, 255 N.C. 162, 164, 120 S.E.2d 529, 531 (1961).  Daniel provided a labor and material payment bond for its work on the Project in the amount of $9,766,000.00.

-11-

In opposition, Daniel argues that it is not attempting to recover damages on behalf of subcontractors who worked on the Project, but that it is attempting to recover its *own* damages incurred as a result of delays caused by DPS. Daniel contends that it has suffered direct damages from DPS's tardy payment on pay applications or belated approval of CORs that resulted in Daniel's own ability to timely pay its subcontractors. According to Daniel, this, in turn, caused Daniel to incur extra expenses such as costs of finding replacement subcontractors and costs incurred in defending lawsuits brought by subcontractors. As Daniel states, "Daniel, not wanting to pay the subcontractors for work not accepted by DPS, would only pay its subcontractors when it received payment from DPS." (*See* Daniel Br. Opp'n Summ. J. 11; Perkins Dep. 31-33; Burnette Aff. ¶ 5, Ex. 545.) Moreover, Daniel contends that there are genuine issues of fact as to whether Daniel incurred these damages.

I agree with DPS that, based on Daniel's own representation of this claim, Daniel's claim for "breach of contract with respect to subcontractors" is not truly an independent claim for breach of contract. Rather, it is a claim for consequential damages incurred by Daniel as a result of DPS's alleged delays and tardy payments. I further agree with DPS that the Contract bars Daniel from bringing claims *on behalf of its subcontractors* based on the *subcontractors'* damages. *See, e.g., Watson Elec. Constr. Co. v. Summit Cos., LLC*, 160 N.C. App. 647, 649-50, 587 S.E.2d 87, 90 (2003) (affirming summary judgment for owner on subcontractor's claim for

-12-

breach of contract against owner, where subcontractor did not have direct contract with owner, and owner did not ratify the subcontract between general contractor and subcontractor).

Furthermore, Daniel cannot recover from DPS those damages arising out of the fact that Daniel failed to pay its subcontractors on time as a result of DPS's failure to pay Daniel on time. This is so because Daniel had the obligation to pay its subcontractors on time regardless of whether DPS paid Daniel on time. *See* N.C. GEN. STAT. § 22C-2 (2003) ("Performance by a subcontractor in accordance with the provisions of its contract shall entitle it to payment from the party with whom it contracts. Payment by the owner to a contractor *is not a condition precedent* for payment to a subcontractor . . . .") (emphasis added); *see also Am. Nat'l Elec. Corp. v. Poythress Commercial Contractors, Inc.*, 167 N.C. App. 97, 101, 604 S.E.2d 315, 317 (2004) (affirming that "pay when paid" clauses in construction contracts are unenforceable). To the extent, however, that Daniel can show that it incurred its *own* damages that arose as a result of DPS's alleged delays in the Project, then Daniel may recover these damages. *See Davidson & Jones, Inc. v. N.C. Dep't of Admin.*, 315 N.C. 144, 154, 337 S.E.2d 463, 469 (1985) (where the court allowed the contractor to recover extra duration-related costs related to work performed by a subcontractor). Moreover, Daniel has shown that there are genuine issues of fact with respect to this claim. Therefore, it will be recommended that the court deny DPS's motion for summary judgment as to this claim.

-13-

In its third cause of action, Daniel alleges a claim for breach of implied
warranty against DPS.  Daniel alleges that in providing the construction documents
to Daniel, DPS represented to Daniel that the design was complete and accurate,
free from error, and that it was therefore adequate for use by Daniel in calculating
its bid, scheduling, and completing the Project.  (Compl. ¶ 50.)  Daniel alleges that
in fact the construction documents were defective, incomplete, inaccurate, and/or
otherwise misleading in many material respects.  (Compl. ¶ 51.)  DPS has filed a
motion for summary judgment on Daniel's claim for breach of implied warranty,
contending that a contractor's claim for breach of implied warranty is not a valid
cause of action but is, instead, a defense that a contractor may raise *only in
response to* a lawsuit against the contractor for construction defects.  (DPS Supp.
Summ. J. Br. 10.)  For the following reasons, this argument is without merit.

The general rule, as set forth in *Gilbert Engineering Co. v. City of Asheville,*
is that a construction contractor who has followed plans and specifications furnished
by the owner, or the owner's architect or engineer, is not responsible for
consequences of defects in those plans or specifications.  74 N.C. App. 350, 362,
328 S.E.2d 849, 857 (1985).  The rationale for the rule is that "there is an implied
warranty by the owner that the plans and specifications are suitable for the particular
purpose, and that if they are complied with the completed work will be adequate to

-14-

accomplish the intended purpose." *Id.* at 363, 328 S.E.2d at 857. A party asserting a claim for breach of implied warranty must show that "the plans and specifications were adhered to, that they were defective, and that the defects were the proximate cause of the deficiency in the completed work." *Id.*

Although a claim for breach of implied warranty is often raised as a defense to a claim against a contractor for construction defects, the North Carolina courts have recognized the validity of a contractor's claim for breach of implied warranty against an owner even in the absence of a direct claim by the owner against the contractor for construction defects. In other words, a claim by a contractor against an owner for breach of implied warranty does not have to be brought *solely* as an affirmative defense. Indeed, in *Gilbert* itself the plaintiff contractor brought the claim for breach of implied warranty as a direct claim against the owner and not as an affirmative defense. As Daniel notes, the North Carolina Court of Appeals in *Gilbert* did not disturb the trial court's assumption that the breach of implied warranty claim was a valid claim under North Carolina law. *See id.* at 362-66, 328 S.E.2d at 856-59.

As another example, in *Battle Ridge Cos. v. North Carolina Department of Transportation*, a highway construction contractor sued the North Carolina Department of Transportation to recover additional compensation for work done. 161 N.C. App. 156, 156-57, 587 S.E.2d 426, 427 (2003). The plaintiff contractor brought claims for breach of contract and breach of implied warranty. *Id.* The claim

-15-

for breach of implied warranty was brought as a direct claim, rather than as a defense against a claim for construction defects. *See id.* The North Carolina Court of Appeals recognized the breach of implied warranty claim as potentially viable as long as it was not barred by sovereign immunity. *See id.* at 160, 587 S.E.2d at 429.

Finally, in *ABL Plumbing & Heating Corp. v. Bladen County Board of Education*, a subcontractor sued a county Board of Education for breach of contract to recover for work done on a construction project. 175 N.C. App. 164, 166, 623 S.E.2d 57, 58 (2005). As one of its claims, the subcontractor alleged that the Board of Education breached an implied warranty because the "drawings, plans, specifications and bidding documents furnished by [the Board of Education] were not sufficient for their intended purpose." *Id.* at 167, 623 S.E.2d at 59 (alteration in original). The North Carolina Court of Appeals in that case *assumed* that the subcontractor had stated a valid claim for breach of implied warranty, but ultimately concluded that the claim was barred by the applicable statute of limitations. *See id.* at 170-71, 623 S.E.2d at 61.

As these cases demonstrate, under North Carolina law a contractor's claim for breach of implied warranty is not, as DPS contends, "inherently" limited in its application to an affirmative defense.[6] In sum, Daniel's claim against DPS for breach

---

[6] To support its contention that a claim for breach of implied warranty can only be asserted as an affirmative defense to a claim for construction defects, DPS cites to *City of Charlotte v. Skidmore, Owings & Merrill*, 103 N.C. App. 667, 407 S.E.2d 571 (1991). Nowhere in *Skidmore*, however, did the North Carolina Court of Appeals state that a claim for breach of implied warranty may only be brought as an affirmative defense.

of implied warranty is a valid claim under North Carolina law and is supported by evidence in the record; therefore, summary judgment is not appropriate as to this claim.[7]

## C. DPS's Motion for Summary Judgment as to Daniel's First Cause of Action Against DPS for Breach of Contract

Next, DPS has moved for summary judgment as to Daniel's claim against DPS for breach of contract. The parties' primary disputes on summary judgment relate to (1) Daniel's contention that DPS wrongfully denied Change Order Requests ("CORs") for work that was already done; (2) Daniel's contention that DPS owes Daniel payment for Daniel's replacement of unsuitable soils; (3) Daniel's contention that DPS wrongly denied Daniel's various requests for time extensions for completion of the Project, and (4) DPS's contention that it should be credited for unused allowances under the Contract.[8]

---

[7] As Daniel further observes, although DPS has not brought a formal counterclaim alleging defective construction, DPS nevertheless maintains in this lawsuit that Daniel is, in fact, responsible for defects in a detention pond that failed inspection and for the fact that a long jump pit constructed by Daniel retains water. Daniel contends that it has presented evidence that it adhered to the plans and specifications for this work, that the plans and specifications were defective, and that the defects proximately caused the deficiency in this work.

[8] DPS concedes that its counterclaim for unfinished Work under the Contract and Liquidated Damages involves factual determinations regarding the status of the Project at various times, the correct balance remaining on the Contract Sum, and the calculation of Liquidated Damages. Therefore, DPS does not dispute that there are issues of fact regarding the amount of liquidated damages to which it may be entitled under the Contract.

-17-

<u>i.  The Contract's Requirements for Making Change Order Requests and Requests</u>

<u>for Extensions of Time</u>

Over the course of the Project, DPS agreed to and paid for modifications to the Contract which increased the Contract Sum on the Project by at least $910,627.00.  (Ex. 401.)  In a letter to DPS dated October 17, 2006, Daniel claimed that it was due additional compensation for certain previously submitted claims that Daniel identified in an attachment to the letter as "Change Order Requests (excluding unsuitable soils)."  (*See* Reeder Aff., Ex. 225.)  Included among those issues is a list of CORs that Daniel contends were improperly denied.   DPS contends that these requests were denied either (1) because they were untimely,[9] (2) because the CORs were for work that Daniel either never did or was not required to do,[10] or (3) for other "substantive" reasons.[11]  With regard to CORs that were denied as untimely, DPS notes that under the Contract Daniel was required to follow specific procedures to make a claim against DPS, as a condition precedent to litigation.  (*See* General Conditions Art. 4.4.1.)  Specifically, Daniel was required to initiate claims "within 21 days after the occurrence of the event giving rise to such

---

[9] DPS asserts that untimely requests included CORs 152, 153, 154, 155, 156, 158, 165, 166, 167, 169, 170, 171, 172, 173, 174, 176, and 177.  (Reeder Aff. ¶ 12(c); Ex. 409(a)-(q).)

[10] DPS asserts that CORs for work that Daniel did not perform or was not required to perform included CORs 51, 135, 142, and 147.  (Reeder Aff. ¶ 12(b); Ex. 408(a)-(d).)

[11] DPS asserts that CORs that were denied for substantive reasons include CORs 42, 45, 50, 151, 157, 159, 161, 182, and 186.  (Reeder Aff. ¶ 12(d); Ex. 411(a)-(i).)

-18-

claim . . . by written notice to the Architect and the other party," with a shorter 10-day window for claims for extension of time. (*See* Article 4.3.2, 4.3.7.2.) A properly filed and documented COR constituted a "claim" as defined under Article 4.3.1 of the Contract. The Contract provides that if these specific procedures are not followed, Daniel must "indemnify and hold harmless the owner from any claims by the contractor's subcontractors arising out of the contractor's failure to submit the claim in a timely fashion." (*See* Gen. Cond. Art. 4.3.2.) DPS contends that because Daniel did not comply with the notice provisions of the Contract in raising these claims, it is contractually required to indemnify and hold harmless DPS from any claims made by subcontractors arising out of its failure to submit the claims in a timely fashion. Similarly, with regard to various requests for time extensions made by Daniel, DPS contends that these requests were also denied as being untimely. DPS further contends that Change Order No. G-4, which implemented the 87-day start delay at the beginning of the Project, conclusively resolved all issues regarding Daniel's claim that it is entitled to time extensions based on seasonal delay.

ii.  Daniel's Contention that the Parties Waived the Time Requirements for Claims and Time Extensions

In response to DPS's summary judgment motion, Daniel contends that each of these arguments raises issues of material fact that preclude summary judgment on these claims. According to Daniel, in compliance with the original Contract terms, in the first few months of the Project, Daniel notified Boney in writing of its claims for

-19-

extensions of time due to delay or as necessitated by additional work performed pursuant to Change Orders.  (*See* Dep. Ex. 7, Ex. 506; Dep. Ex. 15, Ex. 507; Dep. Ex. 22, Ex. 508; Dep. Ex. 23, Ex. 509.)  Daniel maintains that the parties, however, almost immediately abandoned the Contract requirements for requesting and granting extensions of time.   David Reeder, the senior of four construction administrators assigned to the Project by Boney, and J. Bion Fite, Daniel's then Project Manager, each testified that "early on in the project DPS, Boney, and Daniel entered into an "informal agreement [to] address time extensions at the end of the project."  (Reeder Dep. 87-88, 143-44; Fite Dep. 114.)  Accordingly, while Daniel continued to notify Boney of delays that would require time extensions, consistent with the informal agreement Daniel did not make formal requests for time extensions.  Moreover, none of the Change Orders issued throughout the Project address time extensions, as Daniel was led to believe this issue would be resolved at the end of the Project.

Daniel argues that, similarly, the parties promptly abandoned the Contract requirement that no changes in the work be performed without a signed Change Order, and instead DPS and/or Boney would direct Daniel and its subcontractors to perform additional work through oral field directives or in response to requests for information submitted by Daniel without a signed Change Order in place.  (Perkins Dep. 56, Ex. 511; Stevens Dep. 83-84, Ex. 512; Reeder Dep. 76-77.)  Daniel maintains that the Change Orders often were not executed until months after the

-20-

additional work was complete and a Change Order request had been submitted. (*See* Dep. Ex. 27, Ex. 513; Dep. Ex. 37, Ex. 514; Dep. Ex. 48, Ex. 515; Dep. Ex. 52, Ex. 516.)

Daniel further contends that from the beginning of the Project, the parties disregarded the Contract requirements that no changes could be considered unless they were filed within the 21-day period. (*See* Perkins Dep. 56; Reeder Dep. 76-77, 87-88, 143-44.) Daniel contends that DPS and Boney did not attempt to enforce that particular Contract provision until late 2005, when DPS was trying to avoid paying Daniel more than $100,000 for outstanding CORs representing work completed by Daniel at DPS's and Boney's direction. (Sands Dep. 122-27; Dep. Ex. 251; Dep. Ex. 329.) Daniel therefore contends that the parties' modifications of the Contract requirements by agreement and by their course of dealing preclude summary judgment on the issue of the late Change Order requests, including the requests for time extensions.

iii.   Daniel's Contention that DPS and Boney Wrongfully Denied Change Order Requests as a Last Ditch Attempt to Keep the Contract Within Budget

During the course of the Project, DPS approved CORs that increased the Contract Sum by $811,071.00 for an Adjusted Contract Sum of $10,577,071. This increased Contract Sum caused the Project to "push[] the limits" of the Project budget. (Osteen Dep. 113, Ex. 500; Dep. Ex. 328, Ex. 542.) According to Daniel, despite that there was more than $300,000 in outstanding CORs representing work

already completed by Daniel, DPS decided in late 2005 that it was going to limit the total cost of outstanding Change Orders to under $100,000 and directed Boney to carry out tactics to keep the Change Orders under $100,000. (Sands Dep. 122-27; Dep. Ex. 329, Ex. 543.) It was around this time that Boney began recommending that DPS reject CORs that were submitted more than 21 days after the work was performed, even though the parties had in their course of performance abandoned this Contract requirement earlier in the Project. (Dep. Ex. 251, Ex. 544; Dep. Ex. 329.)

Daniel contends that in another attempt to keep the Project within budget, DPS has refused to pay retainage owed to Daniel on the pretense that the Project has not achieved Final Completion. Daniel contends that, in actuality, Daniel has either performed or offered a credit for every legitimate item on the punch lists provided by Boney and its consultants. Daniel contends that Boney has, nevertheless, wrongfully refused to certify the Project as finally complete. (Burnette Dep. 130-32; Perkins Dep. 60; Dep. Ex. 225; Burnette Aff. ¶ 4, Ex. 545.)

Daniel further contends that, in addition to devising ways to avoid paying Daniel for work performed on this Project, DPS and Boney have also attempted to recover money spent on the Project in excess of the projected budget by claiming that Daniel must perform work outside the scope of the Contract and by attempting

-22-

to assert liquidated damages.[12]  Daniel contends that as early as January 2005, DPS was discussing with Boney the possibility of assessing liquidated damages against Daniel, which would allow it to recoup some of its costs on the Project.  (Dep. Ex. 53, Ex. 548; Dep. Ex. 54, Ex. 549.)  Daniel contends that not only did DPS not share this plan with Daniel, but that Daniel relied on DPS's repeated assurances that liquidated damages would not be assessed when it agreed to compromise on certain CORs.  (Burnette Dep. 189; Sands Dep. 213; Dep. Ex. 212, Ex. 550.)  In sum, Daniel contends that the summary judgment motion should be denied because it has presented sufficient evidence that the parties orally modified the Contract so as to waive the written requirements and time limits for CORs and time extension requests.  Finally, with respect to its claim for seasonal delay, Daniel contends that Change Order G-4 is not determinative of time extensions on the Project because the parties also agreed to address time extensions at the end of the Project.

North Carolina Law Governing Oral Modifications of Written Contracts

The original Contract clearly set forth time limits for when CORs had to be submitted, and the Contract also required the requests to be in writing.  The North Carolina Court of Appeals has held that a contractor's breach of contract claim is barred when the contractor fails to comply with such contract notice provisions

---

[12]  Daniel contends, for example, that the Contract specifications required Daniel to seed the athletics fields; however, at a meeting held on June 21, 2006, DPS and Boney erroneously claimed that the Contract required Daniel to sod, rather than seed, the fields.  (Dep. Ex. 65, Ex. 546.)

-23-

regarding the time for submission of claims.  *See Am. Nat'l Elec. Corp.*, 167 N.C.

App. at 100, 604 S.E.2d at 317.  The North Carolina Court of Appeals has also held,

however, that

> provisions of a written contract may be modified or waived by a
> subsequent parol agreement, or by conduct which naturally and justly
> leads the other party to believe the provisions of the contract are
> modified or waived. This principle has been sustained even where the
> instrument provides for any modification of the contract to be in writing.

*J.R. Graham & Son, Inc. v. Randolph County Bd. of Educ.*, 25 N.C. App. 163, 167,

212 S.E.2d 542, 544-45 (1975) (internal citations omitted); *Camp v. Leonard*, 133

N.C. App. 554, 562, 515 S.E.2d 909, 914 (1999); *Son-Shine Grading, Inc. v. ADC*

*Constr. Co.*, 68 N.C. App. 417, 421, 315 S.E.2d 346, 349 (1984) (citing *W.E.*

*Garrison Grading Co. v. Piracci Constr. Co.*, 27 N.C. App. 725, 221 S.E.2d 512

(1975)).

Daniel contends that there are issues of fact regarding whether the parties,

early on in their contractual relationship, orally modified the Contract so that the

written requirements and time limits for change order and other requests were

waived.  DPS responds that, regardless of the North Carolina rule regarding oral

modification of written contracts, that rule does not apply in this case because the

Defendant in this case is a state entity entitled to sovereign immunity.   DPS notes

that "a plaintiff may proceed with a claim against the State for breach of contract only

where the State implicitly waives its sovereign immunity by '*expressly* entering into

a *valid* contract through an agent of the State expressly authorized by law to enter

-24-

into such a contract.'" *Data Gen. Corp. v. County of Durham*, 143 N.C. App. 97, 103, 545 S.E.2d 243, 248 (2001) (quoting *Whitfield v. Gilchrist*, 348 N.C. 39, 43, 497 S.E.2d 412, 415 (1998) (emphasis in original)).  DPS notes that a party may not defeat a claim of sovereign immunity under a theory of estoppel.  *See Data Gen. Corp.*, 143 N.C. App. at 104, 545 S.E.2d at 248.  DPS further argues that at least since the adoption of N.C. GEN. STAT. § 115C-441, all contracts with public bodies such as DPS, to be valid and enforceable, must be in writing, must have been approved by official action of the Board of Education itself, and must be in proper form, including having a preaudit stamp of approval signed by a finance officer.  DPS contends, therefore, that any alleged oral modification of the written contract is invalid.

DPS's argument is without merit.  First, I note that, here, Daniel is not bringing a claim against DPS under an equitable theory of estoppel.  Indeed, the court in the case to which DPS refers–*Data General*–found that there was no valid contract. Here, however, the parties do not dispute that there was a written contract, and Daniel contends that the parties orally modified some of the terms of the contract. I find no North Carolina case holding that the general rule regarding subsequent oral modifications to contracts are not allowed by virtue of the language of N.C. GEN. STAT. § 115C-441.  Therefore, the doctrine of sovereign immunity does not mean that the parties could not subsequently modify the written contract by oral agreement.

-25-

Moreover, I agree with Daniel that there are genuine issues of fact precluding summary judgment on the issue of whether DPS wrongfully denied some of Daniel's Change Order Requests. This issue is inextricably linked to the issue of whether the parties, by their conduct, waived the Contract's time requirements and written requirements for Daniel's submission of CORs as well as for submission of claims. Moreover, issues of fact with regard to the cause of delays in the Project exist. Therefore, summary judgment should be denied as to all of these issues.

DPS's Claim that It Is Entitled to a Credit for Unused Allowances and Daniel's Claim for Monies Owed for Replacement of Unsuitable Soils

Under Article 4 of the Contract and Article 3 of the General Conditions, certain "allowances" were included in the Contract for items that were anticipated to occur, but which could not be precisely quantified in advance, *i.e.*, replacement of unsuitable soils, mass rock, trench rock, and contingencies. (Reeder Aff. ¶ 8.) The use of allowances on public construction projects is a common practice. (*Id.*) The specification of quantities, along with unit prices for certain items, provides the owner with a better understanding of the total cost of the work at the time a contract is awarded. (*Id.*)

In the bidding process, each contractor was required to specify in its bid for the Project both the rate at which it would be allowed to bill for quantities of an item covered by an allowance and the unit price it would charge for quantities in excess of the allowance. The executed Contract incorporated Daniel's unit prices and the

-26-

Allowance quantities specified as bid, and allowances were provided for replacement of unsuitable soil, mass rock, trench rock, and contingencies. (*See id.* ¶ 8.) The Contract further provides that unused amounts of allowances "shall be credited to the Owner by deduct change order prior to approval of Final Application For Payment." (*See id.* ¶ 8(a).)

Under the Contract provisions, Daniel was to be paid for replacing unsuitable soils of up to 3,200 cubic yards, and was to be paid at a specified unit price for replacement of unsuitable soils in excess of the 3,200 cubic yards included in the Allowance. (*Id.* ¶ 9.) Of the allowances provided for under the Contract, only the unsuitable soils allowance was used in its entirety. (*Id.* ¶ 9(a) & Ex. 401.) Daniel also billed for quantities of unsuitable soils in excess of the allowance quantity. (*See id.* ¶ 9(b).) A dispute arose during the Project concerning the proper quantity of unsuitable soils to be billed. Daniel contended that it was due an additional sum of $151,666.00 for excess unsuitable soils that it had removed and replaced. (*Id.*) Boney took the position that a large portion of the soil removed from the site was not inherently unsuitable, but, rather, that Daniel had failed to properly protect the soil and maintain the site, causing the soil to become wet and therefore unusable. (*Id.* ¶ 9(b).)

On June 22, 2006, the parties executed Change Order No. 23. (Dep. Ex. 215, attached to Reeder Aff.) Change Order No. 23 listed the original Contract Sum as $9,766,000.00. The Change Order further stated that the Contract Sum had been

increased by prior Change Orders by the amount of $735,181,000.00, and that the Contract Sum therefore stood at $10,501,181.00. Change Order No. 23 further provided that the Contract Sum was being increased by an additional $75,880.00. Although the Change Order does not specify what the increase was to be used for, DPS contends that this amount refers to additional payment for replacement of unsuitable soils, and that the $75,880.00 is about half of the amount that Daniel had claimed it was owed for the unsuitable soils. The General Conditions of the Change Order state that "the resolution of a Claim by Change Order . . . finally resolve[s] any and all claims arising from the event giving rise to the Claim."

Daniel billed for and was paid $99,805.00 in the categories of trench rock, mass rock, unsuitable soil, and contingencies (used for casework). All other categories had an unused quantity at the end of the Project in the allowance provided. DPS contends that unused amounts in the categories of mass rock, trench rock, and contingencies are amounts that must be credited to DPS under the Contract as unused allowances, and that this credit amounts to $200,395.00. In its final pay application, No. 39-R, which was not approved, Daniel sought to bill for the amount of unused allowances. (*Id.* ¶ 8(c).)

In support of summary judgment, DPS contends that Change Order No. 23 resolved any disputes between the parties over Daniel's right to further payment for replacement of unsuitable soils as well as DPS's claim that it is entitled to be credited for unused allowances. In response, Daniel contends that Change Order

-28-

No. 23 does not resolve the disputed amounts related to unsuitable soils and unused allowances. Daniel notes that on June 21, 2006, the day before execution of Change Order No. 23, the parties met to close out the Project and resolve the outstanding CORs regarding unsuitable soils. Daniel's President Howard Burnette asserts that he agreed to compromise on the amount owed to Daniel for unsuitable soils *on the condition* that DPS would not seek a credit for unused allowance amounts and that DPS would not assert a claim for liquidated damages based on Daniel's delays. (Burnette Dep. 83-87; Sands Dep. 208-13.) According to Daniel, when it became clear that DPS was not going to honor the agreement reached on June 21, 2006, and intended to seek a credit for the unused allowances and assert a claim for liquidated damages, Daniel reinstated its claim for the full amount owed for replacement of unsuitable soils. Therefore, according to Daniel, there is a genuine issue of material fact regarding the amounts owed to Daniel for removal of unsuitable soils in excess of the Contract allowance and the amounts owed to DPS as a credit for unused allowances.

DPS denies that there was ever an alleged oral agreement at the meeting on June 21, 2006. DPS contends that the testimony cited by Daniel in its brief makes clear that there was no agreement regarding the unused allowances: the issue was never discussed, and Burnette testified that he would not have agreed to anything if he had known what DPS's position was on unused allowances and liquidated damages. DPS contends that Burnette's letter the day following that meeting

likewise confirms that there was no agreement since he repudiates any agreement regarding the sodding of the athletic fields, as discussed at the meeting, based on his interpretation of the contract requirements after he read them. Burnette specifically requests written confirmation of the proposal he puts forth in the letter, which does not mention Contract allowances or liquidated damages, but no such written confirmation was ever provided. DPS contends that there was, therefore, no agreement that DPS would forego its credit for unused allowances or its claim for liquidated damages.

I find that there is an issue of fact as to whether the execution of Change Order No. 23 conclusively resolved the parties' dispute over the claims related to unsuitable soils and unused allowances. *See Davidson & Jones, Inc.*, 315 N.C. at 154, 337 S.E.2d at 469 (where a change order did not foreclose a claim for additional reimbursements because the evidence showed that the change order only reflected agreed-upon terms; and where the court found plaintiff retained claims for compensation for additional expenses not included in the change order). Therefore, summary judgment should be denied as to Daniel's claim that it is entitled to payment for replacement of unsuitable soils and DPS's claim that it should be allowed credit for unused allowances under the Contract.

II. Summary Judgment With Respect to Daniel's Claims Against Boney

In its Fourth and Fifth Causes of Action, Daniel alleges claims against Defendant Boney for negligence and professional malpractice.[13] Daniel alleges that Boney was required to exercise the ability, skill, and care customarily used by architects and that Boney breached its duty to act with due care in the following ways: by failing to properly design the Project, by failing to properly prepare the bid documents, by failing to properly administer the Contract between DPS and Daniel, by failing to remain impartial with regard to disputes between Daniel and DPS, by failing to approve CORs and pay applications in a timely manner, by failing to approve CORs to which Daniel was entitled, by failing to approve time extensions to Daniel for delays beyond Daniel's control, by failing to approve payment to Daniel as compensation for delays caused by DPS and Boney, by failing to provide adequate staffing, by failing to establish and maintain continuity among Boney personnel, by failing to prepare an adequate punch list, by requiring Daniel to perform punch list work that was not in Daniel's scope of work, by requiring Daniel

---

[13] The North Carolina courts have recognized that although a subcontractor may not impose contractual duties on an architect that were not assumed by the architect in its contract with the owner, *see Davidson & Jones, Inc.*, 41 N.C. App. at 667, 225 S.E.2d at 584, "a contractor hired by the client to construct a building, although not in privity with the architect, may recover from the architect *any extra costs* resulting from the architect's negligence." *Shoffner Indus., Inc. v. W.B. Lloyd Constr. Co.*, 42 N.C. App. 259, 265-66, 257 S.E.2d 50, 55 (1979) (emphasis added). In *Shoffner Industries, Inc.*, for instance, the North Carolina Court of Appeals recognized that an architect with general supervisory power should be "placed under a duty imposed by law to perform without negligence his functions as they affect the contractor." *Id.* at 266, 257 S.E.2d at 55. "[A] third party general contractor, who may foreseeably be injured or sustained an economic loss proximately caused by the negligent performance of a contractual duty of an architect, has a cause of action against the alleged negligent architect." *Id.* at 267, 257 S.E.2d at 56.

to perform punch list work for items damaged by DPS or students at the middle school, by creating punch list items that would improperly change the landscaping plan, by failing to remove items from the punch list after these items were completed, and by failing to adjust or release the retainage to allow Daniel payment for work completed. (*See* Compl. ¶ 58.) In the Fifth Cause of Action alleging professional malpractice, Daniel alleges that Boney owed Daniel a duty to perform its architectural services in a manner consistent with the standard of care in the architectural profession, and that Boney breached its duty. Daniel alleges that Boney breached its duty in the same manner as it committed negligence. (Compl. ¶¶ 62, 63.)

Defendant Boney has filed a motion for summary judgment as to Daniel's claims of negligence and professional malpractice against Boney. In support of the motion, Boney contends that Daniel has failed to produce an expert competent to testify as to the professional standard of care for an architect. Boney further contends that, in any event, Daniel's expert has failed to set forth the appropriate standard of care or to show that Boney failed to breach that standard. I will address each contention in turn.

Whether Daniel's Claims for Negligence and Professional Malpractice Against Boney
Should Be Treated as a Single Claim for Professional Malpractice

As noted above, Daniel purports to allege two separate claims against Boney–a claim for negligence and a claim for professional malpractice. Boney

contends that these two separate claims are in actuality only one claim for professional malpractice. (Boney's Mem. Supp. Summ. J. 5–6.) I agree. To support its argument that it can bring a negligence claim separate and apart from the professional malpractice claim, Daniel relies on the North Carolina Court of Appeals decision in *Shoffner Industries, Inc. v. W.B. Lloyd Construction Co.*, 42 N.C. App. 259, 257 S.E.2d 50 (1979). (Daniel's Mem. Opp'n Summ. J. 7-8.) The *Shoffner* Court did not, however, recognize a claim for negligence as separate and distinct from a claim for professional malpractice. Rather, the court merely explained that the law "imposes upon every person who enters upon an active course of conduct the positive duty to use ordinary care so as to protect others from harm [and a] violation of that duty is negligence." *Shoffner Indus., Inc.*, 42 N.C. App. at 265, 257 S.E.2d at 55. The court also recognized that the standard of care for

> [o]ne who engages in a business, occupation or profession represents to those who deal with him in that capacity that he possesses the knowledge, skill, and ability, with reference to matters relating to such calling which others engaged therein ordinarily possess.

*Id.* at 268–69, 257 S.E.2d at 57. Thus, rather than recognizing negligence and professional malpractice as distinct causes of action, the North Carolina courts merely recognize that "[w]here a claim arises out of negligence occurring in a professional relationship, the claim is at least 'in the nature' of a [professional] malpractice claim and is treated as such." *MCNC v. Aon Consulting, Inc.*, No. 1:05CV00194, 2006 WL 3733267, at *3 (M.D.N.C. Dec. 14, 2006) (where the plaintiff

-33-

alleged alternative claims for negligent misrepresentation and professional malpractice against a tax adviser, finding that under North Carolina law the plaintiff's theory of professional malpractice "is the one that must proceed if the case is to proceed at all") (citing *Sharp v. Teague*, 113 N.C. App. 589, 592, 439 S.E.3d 792, 794 (1994)). Accordingly, Boney is correct in asserting that Daniel raises only one action–professional malpractice—-and Daniel's Fourth and Fifth causes of action will therefore be treated as one and the same claim.

DPS's Argument that Daniel Has Failed to Present a Competent Expert

Standard for Establishing Professional Malpractice

A prima facie case of professional malpractice requires a plaintiff to produce evidence of (1) the nature of the profession; (2) a duty to meet a certain standard of conduct; and (3) breach of the duty that proximately caused the injury. *MCNC v. Aon Consulting, Inc.*, 2006 WL 3733267, at *3. Thus, as part of the prima facie case, the plaintiff must establish the applicable standard of care for the professional. *See Handex of the Carolinas, Inc. v. County of Haywood*, 168 N.C. App. 1, 10, 607 S.E.2d 25, 31 (2005). The standard of care serves a very important purpose in professional malpractice actions, and usually must be established through expert testimony. *Id.* As the North Carolina Court of Appeals has stated:

> The standard of care provides a template against which the finder of fact may measure the actual conduct of the professional. The purpose of introducing evidence as to the standard of care in a professional negligence lawsuit 'is to see if this defendant's actions "lived up" to that standard[,]'" and generally this is established by way of expert testimony. Implicit in the expert's establishment of the professional

standard of care as the baseline for the jury, is that by way of establishing that standard the expert can assist the jury in discerning whether defendant's professional performance or conduct did not conform therewith, and thus was in breach of that duty and the proximate cause of plaintiff's injury.

*Id.* at 10-11, 607 S.E.2d at 31 (citations omitted) (quoting *Associated Indus. Contractors, Inc. v. Fleming Eng'g, Inc.*, 162 N.C. App. 405, 410, 590 S.E.2d 866, 870 (2004), in turn quoting *Little v. Matthewson*, 114 N.C. App. 562, 567, 442 S.E.2d 567, 570 (1994)).

The only exception to the requirement of establishing the professional standard of care by way of expert testimony is where the "'common knowledge and experience of the jury is sufficient to evaluate compliance with a standard of care[.]'" *Handex,* 168 N.C. App. at 11, 607 S.E.2d at 31 (alteration in original) (quoting *Delta Envtl. Consultants of N.C., Inc. v. Wysong & Miles Co.*, 132 N.C. App. 160, 168, 510 S.E.2d 690, 695 (1999)). This "common knowledge" exception applies either when "(1) the professional's conduct is grossly negligent; or (2) the actions are 'of such a nature that the common knowledge of laypersons is sufficient to find the standard of care required, a departure therefrom, or proximate causation.'" *Associated Indus. Contractors, Inc.*, 162 N.C. App. at 411, 590 S.E.2d at 871 (quoting *Little*, 114 N.C. App. at 567-68, 442 S.E.2d at 571) (some internal quotation marks omitted)).

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993). Rule 702 provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to

-35-

understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." FED. R. EVID. 702. The trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *Daubert*, 509 U.S. at 589. In addition, in accordance with Federal Rule of Evidence 104(a), when faced with a proffer of expert testimony the trial judge must determine at the outset whether there is a preponderance of evidence that the expert is testifying to (1) scientific knowledge that will (2) assist the trier of fact to understand or determine a fact in issue. *Id.* at 592. In making this assessment, the judge must decide whether the reasoning or methodology underlying the testimony, rather than the generated conclusions, is scientifically valid, and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* at 592-93. The Supreme Court has held that the *Daubert* gate-keeping function applies not only to testimony based on scientific knowledge, but also to testimony based on "technical and other specialized knowledge," and the district court has flexibility when it decides how to determine reliability. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141-42 (1999).

The expert evidence forecast by Daniel to establish the standard of care and evidence of a breach of the standard includes the deposition of John Bahr, P.E., as well as an Initial Findings Report prepared by Bahr, dated October 21, 2007, and a Revised Report, dated December 7, 2007. (*See* Ex. E, Bahr Initial Findings Report

dated October 21, 2007, and Ex. F, Bahr Initial Findings Report Revised December 7, 2007.) Bahr is a licensed civil engineer with construction management expertise, but he is not a licensed architect. (*See* Ex. D, Bahr Dep. 6.) Moreover, Bahr admitted in his deposition that he had never before been retained to render an expert opinion against an architect. (Ex. D., Bahr Dep. 219). Boney contends that since Bahr is not a licensed architect, he is therefore not competent to testify as to architectural standards in this case. Boney contends that the Complaint itself makes clear that the applicable standard of care is that of a licensed architect, noting that Daniel alleges that "Boney was required to exercise the ability, skill, and care customarily used by architects on such projects" and that "Boney owed Daniel a duty to perform to its architectural services in a manner consistent with the standard of care in the architectural profession." (*See* Compl. ¶¶ 57, 62.) Boney notes furthermore that Daniel cited *The Architect's Handbook of Professional Practice* in its brief as evidence of the standard of care in this action. (*See* Boney Br. Opp'n Summ. J. 13.) Boney contends that, for this reason alone, the court should find that Bahr is not competent to testify as an expert in this case.

Boney further contends that Bahr's expert testimony is inadequate because at no point, in either of his expert reports, or in his deposition, does Bahr ever state or express any opinion as to the governing professional standard of care. (Exs. D, E, and F.) Boney contends that, at most, Bahr opines that Boney breached the standard of care, but that Bahr's "conclusory allegations of breach provide no

-37-

guidance for a jury to determine whether Boney's services 'lived up' to the standard of care." (Boney Reply Br. 7.) Boney contends that the court should, therefore, grant its motion for summary judgment. *See Reich v. Price*, 110 N.C. App. 255, 258, 429 S.E.2d 372, 374 (1993).

In response, Daniel contends that Bahr is competent to render an expert opinion even though he is not a licensed architect. Daniel points out that most of Daniel's damages do not arise from design defects, but instead from Boney's alleged negligence in providing "contract administration services for the Project." (Compl. ¶ 62.) Indeed, Daniel notes that Boney repeatedly conceded that it provided services that were not strictly architectural in nature. Daniel contends that since the primary disagreement between Daniel and Boney concerns Boney's construction administration services, the standard of care due is that of a professional construction administration service. Moreover, Daniel notes that, although Bahr has never testified against an architect, Bahr *has* testified as an expert in construction management services in a number of cases. (*See* Dep. Ex. 298, Ex. 643.) Daniel contends, therefore, that while Boney is not qualified to testify as to architectural standards of care, he *is* qualified to testify as an expert in construction administration and management. (Bahr Dep. 6:4–25, 219:4–220:21, 239:9–240:5.)

Daniel further contends that it has presented sufficient evidence through the record and Bahr's testimony of the appropriate standard of care and breach of that standard. Daniel apparently concedes that Bahr did not, in his reports or deposition

-38-

testimony, state the professional standard of care. Daniel contends, however, that Bahr's reports and deposition testimony are replete with opinions regarding Boney's performance on the Project that provide a factual basis upon which a jury could find in favor of Daniel. Daniel notes, for example, that in his December 7, 2007, report, Bahr opines that Boney caused delays that impacted the project schedule; that Boney failed to timely review and approve CORs; that Boney failed to timely provide required information and necessary approvals; and that Boney wrongfully inflated punch list costs and the liquidated damages assessment. (Dep. Ex. 289, Ex. 644; *see also* Bahr Dep. 110-11, 163-71, 176, 197, 204-05, 235-39, 242-44, 252-54, 256-58, 259-61, 276-79.) Daniel further contends that, in addition to Bahr's testimony and opinions demonstrating that Boney's actions and omissions fell below the applicable standard of care, the applicable standard of care is otherwise stated in the record. Daniel notes, for instance, that Boney's expert, licensed architect Christopher McClure, was asked several questions in his deposition regarding the applicable standard of care for a professional providing construction administration services.

> Q: What is an architect's duty in construction administration to the contractor in evaluating claims for additional money or time?
> A: They're supposed to provide an impartial evaluation of what the contractor is proposing . . . .
> Q: Is there any tension for the architect in being paid by the owner and the requirement to be fair and impartial to the contractor?
> A: [T]he architect has a professional responsibility to be fair to all parties involved and that includes the contractor . . . .
> . . .
> Q: Need to have an architect who's been fair and impartial in the change order review process?
> A: And has done his job or her job.

. . .
Q: And has--
A: Well, throughout really, throughout the process. Because the architect has a responsibility during the construction process as well as to make sure that if things need to be adjusted that they do it in a way that is proper and looks out for everybody's–everybody's concerns in the process.
Q: In making those types of adjustments they too need to be fair and impartial to the contractor, correct?
A: Yes, they do.

(McClure Dep. 21-23, 26-28, Ex. 641.) McClure testified further that a professional providing construction administration services has to be fair and impartial in the submittal review process and must be timely in its responsiveness to the contractor. (*Id.* 32, 60-61.) Finally, Daniel notes that both Bahr and McClure identified *The Architect's Handbook of Professional Practice* as a recognized treatise on the standard of care for a professional providing construction administration services. (Bahr Dep. 237-40; McClure Dep. 73.) The treatise states that in evaluating any claims under a construction contract, a construction administrator must make "even-handed, fair decisions," and that "reasonable notice" of such decisions must be given to each party. AMERICAN INSTITUTE OF ARCHITECTS, THE ARCHITECT'S HANDBOOK OF PROFESSIONAL PRACTICE 604-05 (13th ed. 2001). Daniel contends that the record therefore contains sufficient evidence as to the applicable standard of care.

Finally, Daniel contends that even if Bahr is not competent to render an expert opinion in this case, that fact is not fatal to Daniel's negligence claim against Boney because the common knowledge exception to the rule regarding expert testimony applies here. Daniel contends that "there is nothing so esoteric about the facts of

-40-

this case that would preclude the finder of fact from determining, based on its common knowledge and experience, that Boney's actions and omissions fall below the standard of care." (Daniel Br. Opp'n Summ. J. 16.) Daniel notes that the contract between Boney and DPS, and the General Conditions incorporated by reference therein, provide specific standards of conduct that act as the template against which the finder of fact should measure Boney's performance. For instance, in the pre-construction phase, Boney was tasked with designing the additions and renovations, determining the phasing of the Project, and setting the schedules for completion of each Phase. (Peele Dep. 15, 18, 24-25.) During the construction phase, Boney acted as DPS's representative and was assigned responsibility for, among other things, the following items: (i) approving Daniel's specification submittals in a reasonably prompt time period, Contract Art. 2.6.4.1; (ii) responding to Daniel's requests for information within fifteen days of receipt, Contract Art. 2.6.1.7, Supp. Conditions 2.6.1(f); (iii) reviewing CORs and other claims submitted by Daniel within ten days of receipt and making recommendations to DPS whether to approve such CORs or claims, Gen. Conditions 4.4.2; (iv) certifying Daniel's applications for payment within ten days of receipt, Gen. Conditions 9.4.1; (v) preparing punch list items to be completed before the Project would be considered finally complete, Gen. Conditions 9.8.3; and (vi) certifying that the Project had attained Final Completion, Gen. Conditions 9.10.1.

Moreover, the Contract between DPS and Daniel made clear that the architect was to play an integral role in the Project. For instance, the Contract explicitly required Daniel to submit Applications of Payment to Boney. The Contract, in turn, required Boney to submit Certificates of Payment to DPS in order for Daniel to be paid. (Ex. 502 Part 1 Contract Article 5 Payment.). Boney was also integrally involved in the Change Order process and Construction Change Directives. (Ex. 502 Part 3 Contract Article 7 Changes in the Work.) Finally, the Contract designated Boney as the mediator for disputes between DPS and Daniel. (*See, e.g.,* Ex. 502 Article 7.2.7 ("If the Owner and Contractor do not agree with the adjustment in the Contract Time or the method for determining it, the adjustment or the method shall be referred to the Architect for determination.")). Daniel has provided evidence that Boney allowed the contract to be modified so that the contractor's request for time extensions would be defrayed until the end of the job. (Bahr Dep. 170:11–171:4.) In addition, Daniel contends that time delays and CORs that Daniel reported to Boney "certainly delayed and disrupted the job." (*Id.* 256:10–257:11.)

Daniel contends that the facts in the record clearly show that Boney failed to meet these standards and, furthermore, that "[i]t does not take an expert to tell the trier of fact, for instance, that Boney's failure to address the repeated notices of delay with a decision regarding a time extension is a breach of the applicable standard of care." (*See* Daniel Br. Opp'n Summ. J. 17.) Daniel further contends that Boney has admitted to failing to meet these standards, thus further negating the

-42-

need for any expert testimony on the matter.  *See Noell v. Kosanin,* 119 N.C. App. 191, 196, 457 S.E.2d 742, 745 (1995) (concluding that expert testimony was not required to defeat summary judgment where defendant's admissions were sufficient to establish the standard of care).  Daniel notes that David Reeder admitted, for example, "I have to take responsibility, some, maybe in some delay in our review [of Daniel's requests for change orders];" that "there was some issues about timely return" of submittals; that the parties agreed to address time extensions at the end of the project; and that Boney improperly included certain items on punch lists.  (*See* Reeder Dep. 45, 59, 87, 127, 143-44.)

I first address Daniel's contention that the common knowledge exception applies so that expert testimony was not required in this case.  If expert testimony was not required, then the court need not address the parties' arguments whether Bahr was competent to testify as an expert.  I find that the common knowledge exception does not apply, and that expert testimony is required in this case.  As Boney notes, the case upon which Daniel relies, *Associated Industrial Contractors*, is not applicable to this case.  In that case, the dispute was whether the columns pinpointed by a surveyor formed a rectangle with 90 degree angles at the corners. *Id.*  In applying the common knowledge exception, the court stated that

> It is within the common knowledge of a trier of fact that a surveyor hired to pinpoint columns for a rectangular building site that must be precisely square must accurately mark column locations so as to result in two sets of parallel lines connected by four 90° angles.  .  .  . [U]nderstanding this task "does not involve esoteric knowledge or uncertainty that calls for the professional's judgment" nor is it "beyond

-43-

the knowledge" of the trier of fact as to whether lines and angles staked
by a surveyor were straight and square.

*Id.* at 412, 590 S.E.2d at 871 (quoting *Daniel, Mann, Johnson & Mendenhall v. Hilton Hotels Corp.*, 98 Nev. 113, 115, 642 P.2d 1086, 1087 (1982)); *see also Erler v. Aon Risks Servs., Inc. of the Carolinas*, 141 N.C. App. 312, 318, 540 S.E.2d 65, 69 (2000) (holding that expert testimony was not required to establish the standard of care applicable to an insurance broker where the issue of whether the broker made misrepresentations to an insured regarding flood insurance coverage was an issue that the jury, based on common knowledge and experience, could decide).

Understanding whether the architectural and construction administration services supplied by Boney on the Project were adequate undoubtedly calls for professional judgment. For example, determining which party should address a particular change order request, submittal, or request for information and how quickly it should be answered is not within the common knowledge of the trier of fact. Therefore, the issues in this case are unlike the relatively simple issue presented in *Associated Industrial Contractors* of whether the engineer had accurately marked column locations so that the building would be perfectly square. Rather, the facts of this case are more like the facts in *Delta Environmental Consultants of North Carolina, Inc. v. Wysong & Miles Co.*, 132 N.C. App. 160, 510 S.E.2d 690 (1999). In that case, a company with contaminated soil and groundwater alleged that an environmental consulting firm negligently performed remedial work. The court stated that "[i]n the case *sub judice*, the standard of care utilized by professional engineers

-44-

for environmental cleanup was at issue. . . ."  *Id.* at 168, 510 S.E.2d at 696.  The court concluded that the consulting firm's work in delineating the scope of contamination was therefore beyond the common knowledge of the jury and required expert testimony.  *Id.*

Similarly, here the standard of care utilized by architects and other entities engaging in construction administration is at issue.  This standard of care is not within the common knowledge of a jury.  Furthermore, Daniel's forecast of evidence does not raise an issue of whether Boney was so grossly negligent that lay knowledge is sufficient to make obvious Boney's alleged shortcomings such that the common knowledge exception may apply.  Finally, I do not agree with Daniel that Boney has "admitted" that it breached the applicable standard of care.  At most, Boney's witness Reeder testified that there were issues regarding delay and Reeder admitted that he was partly to blame for some of the delays.  I do not find that this constitutes an admission of negligence such that an expert opinion is not needed regarding the applicable standard of care.  For these reasons, I agree with Boney that the common knowledge exception does not apply in this case.  Therefore, an expert opinion is necessary to establish the standard of care and breach of that standard.  The issue therefore is whether Bahr was an appropriate expert and whether Daniel has sufficiently presented evidence of the standard of care as well as breach of that standard.

I find that, regardless of whether the proper standard is that of a licensed architect or that of a construction administrator, Daniel has presented no evidence of the professional standard of care in either role for its professional malpractice claim against Boney. For instance, as DPS points out, Daniel's expert Bahr opines in his December 7, 2007, expert report that Boney caused delays that impacted the project schedule, that Boney failed to timely review and approve CORs, that Boney failed to timely provide required information and necessary approvals, and that Boney wrongfully inflated punch lists and the liquidated damages assessment. These conclusory allegations of a breach of the standard of care, however, provide no guidance as to the standard of care so that the fact-finder can determine whether Boney lived up to that standard of care. And, Daniel's expert provides no evidence for what constitutes a "timely" review, i.e., what the standard of care is for the time period that change orders and other requests are to be reviewed, what the standard of care is for punch lists, what the standard of care is for assessing liquidated damages, etc. As DPS notes, Daniel's expert has simply not provided any evidence of the standard of care on these issues. *Accord Flaherty v. Legum & Norman Realty, Inc.*, No. 1:05-1492, 2007 WL 4694346, at *6 (E.D. Va. Jan. 4, 2007) ("Because the Plaintiff cannot establish the applicable standard of care for the handling of public water by a professional property manager or condominium manager, there is a failure of proof on a required element 'duty' of Plaintiff's claim, and therefore summary judgment for the defendant is appropriate.").

-46-

Moreover, merely referencing *The Architect's Handbook of Professional Practice* is not enough to establish the appropriate standard of care. *See Michael v. Huffman Oil Co.*, __ S.E.2d __, 2008 WL 1946546, at *4-6 (N.C. Ct. App. 2008) (agreeing with the trial court's ruling that an expert's use of a code of ethics for engineers was insufficient to establish the standard of care applicable to a professional engineer in a lawsuit involving the death of two subcontractors working on an underground water main project). The only evidence that could possibly establish the standard of care is testimony by Boney's expert McClure that a professional in Boney's position has the duty to remain impartial and fair in assessing matters such as change order requests. This is too vague to establish a standard against which the trial court may judge Boney's actions. I agree with Boney that Plaintiff has simply failed to sufficiently set forth the standard of care in this case.

In sum, there is no genuine issue of fact as to whether Boney's conduct conformed to the relevant professional standard of care. *Accord Williamson v. Woodard Funeral Home, Inc.*, No. COA07-182, 2008 WL 132004, at *4 (N.C. Ct. App. Jan. 15, 2008) (unpublished) ("Nothing in plaintiffs' affidavits, depositions, or other discovery materials presented a standard against which the trial court could evaluate defendant's conduct."); *Rorrer v. Cooke*, 313 N.C. 338, 356, 329 S.E.2d 355, 366-67 (1985) (affirming summary judgment where the expert in a legal malpractice action did not sufficiently set forth the appropriate standard of care that

-47-

a lawyer owed his client where the lawyer defendant had represented the plaintiff in a medical malpractice action against a third party). For these reasons, it will be recommended that the court grant summary judgment as to the professional malpractice claim against Boney.

## **CONCLUSION**

For the reasons stated herein, **IT IS RECOMMENDED** that the court **DENY** the motion for summary judgment brought by DPS (docket no. 43) and **GRANT** the motion for summary judgment brought by Defendant LS3P Associates, Ltd. ("Boney") (docket no. 41). Finally, because trial is scheduled to commence on July 7, 2007, there is no need to address at this date DPS's request in its counterclaim for a declaratory judgment allowing it to continue holding as retainage certain funds under the Contract.

_____
WALLACE W. DIXON
United States Magistrate Judge

June 6, 2008